**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **United States of America,** ) | **CASE NO. 1:15 CR 263** |
| ) | |
| **Plaintiff-Respondent,** ) | **JUDGE PATRICIA A. GAUGHAN** |
| ) | |
| **Vs.** ) | |
| ) | |
| **Daryl Dane Donohue,** ) | **Memorandum of Opinion and Order** |
| ) | |
| **Defendant-Petitioner.** ) | |

This matter is before the Court upon Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Doc. 298). For the reasons that follow, Petitioner's motion is DENIED.

**FACTS**

On May 6, 2016, a jury found Petitioner Daryl Dane Donohue and three co-conspirators guilty of numerous charges relating to an investment fraud scheme. The scheme involved the development of a hypodermic syringe destruction device called the "Sharps Terminator." The Sixth Circuit, in its opinion affirming the convictions of all co-conspirators, discussed the evidence produced at trial regarding the conspiracy. The relevant portions of the court's discussion are quoted below:

In August 1992, defendant Kenneth Jackson was convicted in Ohio state court of multiple counts of unlicensed sales of securities and sales of unregistered securities, passing bad checks, perjury, theft and aggravated theft. The convictions stemmed from Jackson's operation of what the government has characterized as a $13 million Ponzi scheme involving sales of securities in "Vision Television Network." As a consequence, Jackson was incarcerated from 1992 to 1999. He was also prohibited, by injunction of the Securities and Exchange Commission ("SEC"), from holding any corporate officer or director position in a publicly traded company. Jackson was also subject to a disgorgement order requiring him to pay $1.8 million to the SEC.

Despite these setbacks, in 2002, Jackson had become director of research and development for Event Future (a/k/a E-Med), a company he and co-defendant Daryl Dane Donohue established to design and manufacture a hypodermic needle destruction device called "Needlezap." The Needlezap disposes of used needles by crushing them. It is a Class III medical device requiring Food & Drug Administration ("FDA") approval before marketing. Donohue was employed by E-Med to address the FDA's regulatory compliance requirements. The Needlezap was granted FDA approval in 2003 and was patented in 2006.

In 2007, Jackson left E-Med and he and co-defendant William Schureck created Medical Safety Solutions ("MSS") to develop and market an improved version of the Needlezap called the "Sharps Terminator." The Sharps Terminator was designed to dispose of used needles by incinerating them. Again, FDA premarket approval was required. Donohue was hired by MSS as a regulatory compliance consultant, but Jackson, director of research and development, was responsible for obtaining FDA approval of the Sharps Terminator....

To raise funds for development of the Sharps Terminator by selling securities, MSS prepared two prospectuses, "Prospectus A" (2007) and "Prospectus B" (2009). ...What the prospectuses did not include, relevantly, was any mention of MSS co-founder Jackson's prior convictions for theft and securities fraud offenses. Nor did the prospectuses disclose that the conduct for which Jackson was convicted also precipitated action by the SEC that resulted in a $1.8 million judgment against him, as well as an injunction prohibiting him from holding any officer or director position in a publicly traded company.

In the summer of 2007, MSS began displaying its plans for the Sharps Terminator and soliciting investments at medical trade shows. MSS raised $5 million from investors in response to Prospectus A....

In July 2007, MSS also purportedly commenced efforts to obtain FDA premarket approval and told inquiring investors for years that progress was slow, but approval was imminent. In fact, Jackson testified, it was not until October 2012 that he first filed the application for premarket approval. The FDA responded to the application a month later with the first of several deficiency letters, which MSS was attempting to address when, in March 2013, its efforts were undercut by execution of a search warrant and seizure of MSS files and

records. In the meantime, the FBI had begun investigating MSS's operations.

*United States v. Donohue*, 726 F. App'x 333, 337–39 (6th Cir. 2018), *cert. denied sub nom. DeCiancio v. United States*, No. 18-5253, 2018 WL 3475380 (U.S. Oct. 1, 2018).

Ultimately, the FBI's investigation led to a 31-count indictment, charging Petitioner and three co-defendants (Jackson, Schureck, and Dennis Deciancio) with various offenses, including conspiracy, mail fraud, wire fraud, and securities fraud. The charges were premised on allegations that defendants, in soliciting investments for development and marketing of the Sharps Terminator device: falsely represented the status of FDA premarket approval proceedings, the market-readiness of the Sharps Terminator, and the use to which invested funds would be applied; and failed to disclose material information to prospective investors about Jackson's prior convictions.

After a joint trial, the jury found the defendants guilty of almost all charged offenses. Defendants were sentenced on October 25, 2016, to various prison terms. Petitioner was sentenced to 46 months of imprisonment, which was the low end of the Guidelines range and considerably less time than his co-defendants received. The judgments of sentence were entered on November 1, 2016, and Petitioner timely filed a notice of appeal. On January 5, 2017, this Court entered a restitution order, ordering all defendants, jointly and severally, to pay restitution in the amount of $9,825,917.41. The Court entered amended judgments, incorporating all terms and conditions of the sentences, on February 6, 2017. Petitioner did not file a notice of appeal from his amended judgment.

On appeal, Petitioner challenged this Court's denial of a motion in limine to exclude evidence relating to co-defendant Jackson's criminal history and SEC disgorgement order, the

3

sufficiency of the evidence at trial, the Court's restitution order, and the procedural and substantive aspects of his sentence. The Sixth Circuit rejected all of his arguments and affirmed his conviction, sentence, and the restitution order.

Petitioner filed his timely § 2255 motion on August 27, 2018. The government opposes the motion. In support of its opposition, the government has attached the affidavit of Michael J. Goldberg, Petitioner's trial and appellate counsel.[1]

**STANDARD**

A federal prisoner may challenge a sentence if it "was imposed in violation of the Constitution or laws of the United States ... or ... the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. To prevail on a § 2255 motion, "the movant must allege as a basis for relief: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Mallett v. United States*, 334 F.3d 491, 497 (6th Cir. 2003). The petitioner has the burden of "sustaining [his] contentions by a preponderance of the evidence." *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

**ANALYSIS**

---

[1] Petitioner concedes that the attorney-client privilege is impliedly waived once a petitioner initiates a § 2255 claim of ineffective assistance of counsel based on conversations or advice given by counsel. (Doc. 304, at PageID 9261); *see, e.g., United States v. Clark*, No. 1:10-CR-366, 2013 WL 74616, at *2 (W.D. Mich. Jan. 7, 2013) (quotations omitted) ("A habeas petitioner who injects issues which require testimony from his attorneys or testimony concerning the reasonableness of the conduct of his attorneys, impliedly waives the attorney-client privilege. The privilege is waived to the extent necessary to litigate the petitioner's ineffective assistance of counsel claims."). Counsel's affidavit is limited to the issues raised by Petitioner in his ineffective assistance of counsel claims.

4

Petitioner raises three claims for relief, all based on ineffective assistance of counsel: (1) counsel was ineffective for advising Petitioner not to testify on his own behalf; (2) counsel was ineffective for failing to request a severance in light of the admission at trial of Jackson's prejudicial past convictions; and (3) counsel was ineffective for failing to argue against the imposition of restitution.

To establish an ineffective assistance of counsel claim, a petitioner must prove that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The deficient performance prong requires a "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. A court's scrutiny of counsel's performance "must be highly deferential." *Id.* at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The prejudice prong requires the petitioner to show more than some conceivable effect on the judgment. *Id.* at 693. Rather, to prove that counsel's performance was prejudicial, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

**A. Claim One**

Petitioner claims that counsel rendered ineffective assistance by advising him not to testify on his own behalf. According to Petitioner, this advice "was wrongly given because the strength of the government's case against [him] was circumstantial at best, and [he] wanted to tell his story to the jury." (Doc. 298, at PageID 9195). Petitioner believes that if he had "looked into the eyes of the jury and explained his actual involvement which lacked the mens rea and

5

actus reus, the dearth [of] circumstantial evidence against [him] would have ha[ve] resulted in a guilty verdict." (Doc. 304, at PageID 9262).

A defendant's right to testify at trial "is a constitutional right of fundamental dimension and is subject only to a knowing and voluntary waiver by the defendant." *United States v. Webber,* 208 F.3d 545, 550-51 (6th Cir. 2000). Nevertheless, unless a defendant provides some indication that he disagrees with counsel or that he desires to testify, "the trial court is neither required to sua sponte address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify, nor ensure that the defendant has waived the right on the record." *Id.* Indeed, the law in the Sixth Circuit has long been that "when a tactical decision is made not to have the defendant testify, the defendant's assent is presumed." *Goff v. Bagley*, 601 F.3d 445, 471 (6th Cir. 2010) (quotations omitted). If the defendant disagrees with this decision, it is his duty to "alert the trial court that he desires to testify or that there is a disagreement with defense counsel regarding whether he should take the stand." *Id.* "When a defendant does not alert the trial court of a disagreement, waiver [of the right to testify]... is presumed from the defendant's failure to testify or notify the trial court of the desire to do so." *Id.*

In his affidavit, counsel explains the tactical reasons for advising Petitioner not to testify, which included that Petitioner would be better served by establishing his defense through cross-examination of other witnesses, including co-defendants Jackson and Schureck.[2] Counsel was

---

[2] During cross examination of Schureck and Jackson, counsel asked questions designed to demonstrate that Donohue was a limited participant who did not knowingly make any material misrepresentations or omissions. (Goldberg Dec. ¶ 7).

6

also concerned that if Petitioner took the stand in his own defense, the government would use the evidence to undermine his defense that he did not knowingly participate in the conspiracy. (Goldberg Dec. ¶ 7). Counsel explained his reasoning to Petitioner, but also states that he "clearly told [Petitioner] that the decision about whether to [testify] was ultimately his." (*Id.* ¶ 8).

The evidence shows that Petitioner's decision not to testify was both knowing and voluntary. He does not dispute that counsel told him that the decision about whether to testify was his or that counsel explained the reasons for advising him against testifying on his own behalf. Nor does he point to any evidence in the record showing that he alerted this Court that he disagreed with counsel's advice or that he desired to testify. Accordingly, his assent to counsel's tactical decision is presumed, as is his waiver of the right to testify. Thus, Petitioner cannot establish that counsel was ineffective for advising him not to testify.

**B. Clam Two**

In Petitioner's second claim, he asserts that trial counsel was ineffective for "failing to request for severance when it clearly appeared the Court was going to allow past convictions of [Petitioner's] co-defendant to be...presented at trial." This issue relates to the denial of co-defendant Jackson's motion in limine, which asked the Court to prohibit the government from introducing evidence of his prior convictions against him. This Court ruled that the prior convictions were admissible because they were direct proof of the charged scheme, i.e., that the defendants knew of material information that they withheld from investors in order to carry out their scheme to defraud. The Sixth Circuit affirmed the denial of the motion. In doing so, it noted that materiality is a "fluid concept, dependent on the totality of the circumstances, viewed from an objective perspective" and that several circuits have held that a failure to disclose prior

7

convictions can amount to a fraudulent omission of material fact. *Donohue*, 726 Fed. Appx. at 341-343 (also holding that the number of references during the trial to Jackson's prior convictions was not prejudicial).

Petitioner does not show that counsel's failure to file a motion to sever falls below an objective standard of reasonableness. "There is a preference in the federal system for joint trials of defendants who are indicted together. Joint trials...promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537, 113 S. Ct. 933 (1993) (internal citations and quotations omitted). A motion to sever should only be granted where a defendant "show[s] compelling, specific, and actual prejudice from [the]...refusal to grant the motion to sever." *United States v. Gardiner*, 463 F.3d 445, 472–73 (6th Cir. 2006) (citations omitted)). Severance is inappropriate "where the same evidence is admissible against all defendants....Moreover, 'a defendant is not entitled to severance because the proof is greater against a co-defendant.'" *Id.* (quoting *United States v. Warner,* 971 F.2d 1189, 1196 (6th Cir.1992)).

Petitioner does not identify any compelling, specific, and actual prejudice that would have entitled him to a severance. He points to only one reason that his counsel should have moved to sever his trial: that evidence of Jackson's previous convictions would be admitted in a joint trial. But counsel recognized that the same evidence would have been introduced at trial even if Petitioner were the only defendant: "The charges against [Petitioner] included that he had failed to tell investors about Ken Jackson's criminal history and trouble with the SEC. Therefore, even if [the Court] had severed [Petitioner's] trial from that of his codefendants, the government nonetheless would have presented at his trial witness testimony about Jackson's history of

8

committing securities fraud and [Petitioner's] failure to disclose it." (Goldberg Dec. ¶ 5). As the Sixth Circuit's opinion demonstrates, counsel's assessment was correct. Moreover, counsel had reasonable strategic reasons for wanting a joint trial, which allowed him to emphasize the four defendants' comparative roles and claim that, to the extent Petitioner made false statements, he made them innocently. (*Id.* ¶ 6).

Because severance would not have been appropriate in this case, counsel's decision not to file a motion for severance was not unreasonable and did not prejudice Petitioner.

**C. Claim Three**

1. Loss amount and restitution

In Petitioner's third claim, he asserts that counsel was ineffective for failing to argue that Petitioner "should not be held accountable to paying restitution and not filing a notice of appeal." (Doc. 298, at PageID 9202). The basis for Petitioner's claim is not entirely clear, as it appears that he may also (or instead) be arguing that counsel was ineffective by conceding that the Court could find a loss amount. Either way, Petitioner's claim is without merit.

Following the jury's verdict, counsel filed a sentencing memorandum and other briefing addressing the issues of loss amount and restitution. In explaining his reasoning for the arguments that he made regarding loss amount and restitution, counsel states:

> In light of [Petitioner's] conspiracy conviction, the evidence presented at trial, and sentencing law regarding a defendant's responsibility for jointly undertaken and reasonably foreseeable conduct, which does not limit loss to an individual defendant's personal gain, I determined that the Court would almost certainly apply a loss amount of at least $3,500,000..., and perhaps even a loss amount in excess of $9,500,000 without the government's agreement not to advocate for that amount. I therefore decided that, in my professional judgment, the best strategy to pursue for [Petitioner] was to advocate instead that the Court (1) should not apply other enhancements that the PSR and/or the government recommended applying; (2) should apply a greater reduction than the PSR and/or

9

>    the government recommended; and (3) seek a downward variance or departure.
>    Specifically regarding the issue of restitution I further filed a brief and argued that, because the investors continued to hold shares in MSS, and because another entity was pursuing FDA approval and marketing of the Sharps Terminator, even though the Court would find a guideline loss amount, the Court should not impose any restitution at all on Petitioner.

(Goldberg Dec. ¶¶ 9-10).

With respect to loss amount, counsel's determination that the Court would find a loss amount and that it would be at least $3,500,000 (corresponding to an 18-level specific offense characteristic increase) and perhaps in excess of $9,500,000 (corresponding to a 20-level specific offense characteristic increase)[3] was reasonable in light of U.S.S.G. § 1B1.3. Under § 1B1.3, "in the case of a jointly undertaken criminal activity..., all acts and omissions of others that were within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity" shall be included in determining the proper loss amount. Thus, as counsel accurately recognized, the Sentencing Guidelines do not limit loss to an individual defendant's personal gain, nor to only those losses that he directly caused himself. Therefore, his decision to focus on limiting the loss amount to below $9,500,000 and on other avenues for reducing Petitioner's sentence was certainly not such a serious error that he "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

As far as restitution, Petitioner is incorrect that counsel waived his challenge to the imposition of restitution. As counsel explained in his affidavit, he filed a brief asking the Court

---

[3] Counsel noted in his sentencing memorandum that he had been informed that the government would stipulate to a loss level under $9,500,000.00, which would result in "an agreed offense level increase under UGGG 2B1.1(b)(1)(I) of 18."

10

to impose no restitution at all against Petitioner. (*See* Doc. 200). He, along with counsel for Petitioner's co-defendants, argued that restitution would be inappropriate because most of the defrauded investors continued to hold MSS stock. They contended that the stock had value because a third-party company had taken over the Sharps Terminator and its FDA premarket approval application and was attempting to bring it to market. As such, they asserted that the investors' shares in MSS made them whole. In making these arguments, counsel attempted to distinguish the key Sixth Circuit case on the issue, *United States v. Healy*, 553 Fed. Appx. 560 (6th Cir. 2014). Although this Court ultimately rejected Petitioner's (and his co-defendants') arguments and found that *Healy* applied, counsel rendered adequate assistance and exercised reasonable professional judgment in addressing the issue of restitution.

Moreover, Petitioner has not shown that he was prejudiced by counsel's performance on these issues. He fails to establish a reasonable probability that, had counsel argued for a zero loss amount, the Court would have either determined a zero loss amount or declined to impose restitution. Indeed, on appeal, the Sixth Circuit held that this Court's determination of both the loss amount and the imposition of restitution was appropriate. *See Donohue*, 726 Fed. Appx. at 355, 358.

### 2. Second notice of appeal

Petitioner also argues that counsel was ineffective for failing to file a second notice of appeal after this Court entered its restitution order. Petitioner cites *Manrique v. United States*, 137 S. Ct. 1266 (2017), in support of this argument. In *Manrique*, the Supreme Court held that a single notice of appeal from an initial judgment deferring the determination of restitution is not sufficient to invoke appellate review of a later-determined restitution amount in an amended

11

judgment, at least where the government objects. *Id.* at 1270.

The Sixth Circuit addressed the effect of *Manrique* on Petitioner's direct appeal. The court recognized that the Supreme Court held that filing a notice of appeal from an amended judgment imposing restitution is a mandatory claims-processing rule and that, if the failure to meet such a rule is raised, the court's duty to dismiss the appeal is mandatory. But it also recognized that *Manrique* was not decided until after the amended judgments in this case were entered and that, under previous Sixth Circuit law, the issue of restitution would have been deemed properly before the court by virtue of the original timely-filed notice of appeal. *Donohue*, 726 Fed. Appx. at 356. In any event, the court determined that, whether it applied the rule of *Manrique* or addressed the merits, Petitioner's claims regarding restitution failed.

For these reasons, Petitioner cannot prove either prong of an ineffective assistance of counsel claim. Counsel's decision not to file a second notice of appeal was reasonable in light of the Sixth Circuit law at the time. And, even if the failure to file a second notice was deficient, Petitioner cannot establish prejudice.

### **CONCLUSION**

For the foregoing reasons, petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Doc. 298) is DENIED. Petitioner's request for an evidentiary hearing is also denied. No hearing is necessary where the "motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *Wright v. U.S.*, 320 Fed. Appx. 421, 426 (6th Cir. 2009). Furthermore, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability. 28 U.S.C. § 2253; Fed. R. App. P. 22(b).

IT IS SO ORDERED.

    /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Court
Chief Judge

Dated: 11/8/18